UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| DR. JOHN MILTON PEACOCK and MS. ROBBIE COWAN, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. |
| | § | <u>CLASS ACTION</u> |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| AARP, INC., AARP SERVICES INC., AARP INSURANCE PLAN, UNITEDHEALTH GROUP, INC. and UNITEDHEALTHCARE INSURANCE COMPANY, | § § § § | |
| | § | |
| Defendants. | § | |
| | § | <u>DEMAND FOR JURY TRIAL</u> |

**CLASS ACTION COMPLAINT**

Plaintiffs Dr. John Milton Peacock and Ms. Robbie Cowan (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against the herein-named defendants, and upon information and belief, except as to the allegations within Plaintiffs' personal knowledge, allege as follows:

## SUMMARY OF THE ACTION

1.      This is a consumer class action seeking to recoup millions of dollars on behalf of a class of senior citizens and disabled individuals residing in the State of Texas who, by the deceptive practices and unlawful acts alleged herein, were fooled into paying artificially inflated insurance charges for Medicare supplemental health insurance policies so that defendants could use the inflated portion of the payment for illegal purposes – namely the payment of insurance commissions to an unlicensed entity.

2.      Defendant AARP, Inc. and its subsidiaries (collectively, "AARP"), formerly known as the American Association of Retired Persons, is a tax-exempt, "non-profit" membership organization for seniors aged 50 years and older.  AARP has long been regarded as a protector and advocate of the nation's senior community, and today, AARP is reported to have over 40 million members – about half of whom are over the age of 65, and all of whom recognize and trust the AARP name.

3.      Despite its "non-profit" status, however, AARP reaps substantial income through business partnerships with large insurance companies like defendants UnitedHealth Group, Inc. and UnitedHealthcare Insurance Company (collectively, "UnitedHealth") in the form of commissions.

4.      As alleged herein, defendants AARP and UnitedHealth, together and through their respective subsidiaries (collectively, "Defendants"), have orchestrated an elaborate scheme where AARP, as the de facto agent of UnitedHealth, helps market, solicit and sell or renew "AARP-branded" Medicare supplement health insurance policies ("AARP Medigap") on behalf of

UnitedHealth, and also collects and remits insurance premiums and generally administers the AARP Medigap program for UnitedHealth, in exchange for a 4.95% commission from each new policy or renewal.

5.      While Defendants disclose the existence of a payment in general that goes from UnitedHealth to AARP, which they call a "royalty" for the use of AARP's intellectual property, Defendants hide the fact that the payment to AARP is actually a percentage of premium commission that is charged to unsuspecting seniors and the disabled *in addition to* their insurance premium paid to UnitedHealth for coverage.

6.      Defendants' motive to term a commission payment a "royalty" is two-fold: it allows AARP to avoid oversight by insurance regulators, and it allows AARP to avoid paying taxes on the income it generates through insurance sales.  Calling the commission payment a "royalty" is merely a fiction created by Defendants to further their illegal scheme.

7.      Indeed, other associations similar to AARP do the right thing and acquire a license to act as an agent, subjecting themselves to regulatory oversight, and paying taxes.[1]

8.      As detailed herein, Defendants' acts are unlawful because they violate the Texas Insurance Code (the "Code").  For example, AARP is not licensed as an insurance agent in the State of Texas; however, it regularly acts as the de facto agent for UnitedHealth by helping market, solicit and sell AARP Medigap policies, acts that UnitedHealth appointed AARP to perform – both clear violations of the Code.  *See* Tex. Ins. Code §4001.101.

---

[1]      The automobile club AAA, for example, is licensed to sell insurance.  In addition, the State Bar of Texas Insurance Trust ("SBOTIT") operates a fully licensed subsidiary: "The SBOTIT offers Life, Disability, Office Overhead, and a few other select products exclusively to members of the State Bar of Texas and their families.  The SBIT Insurance Agency, LLC is wholly owned by the SBOTIT and is licensed in Texas to offer Life, Health, and Dental insurance products to members of the Bar and the general public through its appointed companies."  *See* http://www.sbotit.com/faq (FAQ: *What is the difference between the State Bar of Texas Insurance Trust (SBOTIT) and the SBIT Insurance Agency, LLC?*).

9.       Because AARP is not licensed as an insurance agent, it may not collect a commission for its marketing, soliciting or selling/renewing of AARP Medigap policies on behalf of UnitedHealth, and UnitedHealth may not pay such a commission to AARP.  *See* Tex. Ins. Code §4005.053.

10.       In addition, Defendants' deception is a false and deceptive business practice under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code §17.41, *et seq.* and §17.50(a), which operates as a violation of the Code itself.  *See* Tex. Ins. Code §541.151(2).

11.       The end result of Defendants' violations of the DTPA and the Code is that consumers are charged an artificially inflated amount for insurance coverage that is prohibited by law.

12.       To be sure, similar Medigap policies offered without the "AARP brand" offer identical benefits often at a lower cost in part because those insurers do not secretly charge unlawful insurance agent commissions to consumers.

13.       Ultimately, Defendants' deceptive and unlawful scheme takes advantage of unsuspecting senior citizens and the disabled who, unfortunately, put their trust in the AARP name.

14.       But for Defendants' deceptive and unlawful acts, Plaintiffs and the other members of the class, as defined below (the "Class"), would not have agreed to pay the 4.95% illegal insurance commission secretly charged on top of their insurance premiums.

15.       Plaintiffs and the Class were injured by the actual loss of the 4.95% commission payment and paid more for AARP Medigap insurance because of Defendants' challenged conduct.

16.       Plaintiffs bring this action on behalf of the Class for equitable relief and, if this matter is not resolved within 31 days from the date of filing, to recover damages resulting from Defendants' conduct under §§541.251 and 541.151 of the Code.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

18.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because many of the acts and transactions giving rise to this action occurred in this District, because a named plaintiff resides in this District, and because Defendants:

(a)     are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of AARP Medigap policies in this District;

(b)     conduct substantial business in this District; and

(c)     are subject to personal jurisdiction in this District.

## PARTIES

**Plaintiffs**

19.     Plaintiff Dr. John Milton Peacock is a resident of Dickinson, Texas, and purchased an AARP Medigap policy in 2007 in Texas when he became eligible for Medicare.  But for Defendants' deceptive and unlawful acts, as alleged herein, Dr. Peacock would not have agreed to pay 4.95% above the premiums due to UnitedHealth for an AARP Medigap policy. Dr. Peacock allowed his policy to lapse in December 2012 after the amount due for coverage increased.

20.     Plaintiff Robbie Cowan is a resident of Tyler, Texas, and purchased an AARP Medigap policy in 2002 in Texas after seeing an advertisement in *AARP Magazine*.  Ms. Cowan is a current AARP Medigap policyholder, and her bank account is automatically debited monthly for the payment due on her AARP Medigap insurance, which includes a 4.95% illegal commission to

AARP.  But for Defendants' deceptive and unlawful acts, as alleged herein, Ms. Cowan would not have agreed to pay 4.95% above the premiums due to UnitedHealth for an AARP Medigap policy.

**Defendants**

21.     Defendant AARP, Inc. is a non-profit corporation organized under the laws of the District of Columbia and maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049.  AARP, Inc. conducts substantial business in the State of Texas.

22.     Defendant AARP Services, Inc. ("ASI") is a wholly-owned subsidiary of AARP, organized under the laws of Delaware.  ASI maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049.  ASI conducts substantial business in the State of Texas.  ASI is AARP's taxable "for-profit" division that negotiates, oversees, and manages lucrative contracts with AARP's insurance business partners.  AARP created ASI in 1999 pursuant to a settlement agreement with the U.S. Internal Revenue Service ("IRS") resulting from an investigation by the IRS into the large amount of income that AARP, Inc., a "non-profit" tax-exempt organization, earned through its "endorsement" deals.  This settlement was one of several that AARP, Inc. entered into with the IRS and other entities, such as the U.S. Postal Service and the tax authorities of the District of Columbia, all relating to AARP, Inc.'s failure to fully pay unrelated business income tax on its commercial activities, as well as improperly mailing health insurance solicitations at non-profit rates.

23.     Defendant AARP Insurance Plan ("AARP Trust") is a grantor trust organized by AARP, Inc. under the laws of the District of Columbia and maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049.  AARP Trust is the vehicle through which AARP, Inc. collects, invests and remits premium payments for AARP Medigap policies and collects its unlawful 4.95% commission.  AARP Trust conducts substantial business in the State of Texas.

24.     At all material times, defendant AARP, Inc. dominated and controlled defendants ASI and AARP Trust.

25.     Defendants AARP, Inc., ASI, and AARP Trust are collectively referred to herein as "AARP."

26.     Defendant UnitedHealth Group, Inc. ("UnitedHealth Group") is an insurance corporation organized under the laws of the State of Minnesota and maintains its corporate headquarters in Minnetonka, Minnesota.  UnitedHealth Group conducts substantial business in the State of Texas.  UnitedHealth Group is the largest single health insurer in the United States.

27.     Defendant UnitedHealthcare Insurance Company is an operating division and wholly owned subsidiary of UnitedHealth Group and maintains its corporate headquarters in Hartford, Connecticut.  UnitedHealthcare Insurance Company conducts substantial business in the State of Texas.  AARP Medigap plans are insured by UnitedHealthcare Insurance Company.

28.     Defendants UnitedHealth Group and UnitedHealthcare Insurance Company are collectively referred to herein as "UnitedHealth."

## FACTUAL ALLEGATIONS

29.     Defendant AARP, formerly known as the American Association of Retired Persons, is a tax-exempt, non-profit membership organization for seniors aged 50 years and older.  AARP has long been regarded as a protector and advocate of the nation's senior community, and today, AARP is reported to have over 40 million members – about half of whom are over the age of 65, and all of whom recognize and trust the AARP name.

30.     By any measure, AARP is a large, complex, and sophisticated enterprise with over $3 billion in total assets and operating revenues of over $1.3 billion in 2012.

31.     Despite its "non-profit" status, however, AARP earns substantial revenue through business partnerships with large insurance companies, like defendant UnitedHealth, to sell its own "AARP-branded" insurance policies.

32.     Among other products, AARP endorses three types of Medicare-related insurance: Part D prescription drug insurance, Medicare Advantage, and Medigap.

33.     Medigap plans offer extra coverage to Medicare beneficiaries (*i.e.*, seniors and the disabled) enrolled in traditional Medicare, such as first-dollar coverage and reduced co-payment and deductibles.  In addition, all Medigap plans provide coverage for hospital stays and reduce seniors' out-of-pocket costs for physician office visits.  Medigap enrollees must pay a monthly premium that exceeds their Medicare premium in order to receive these additional benefits.  In 2012, over 10 million Americans were enrolled in a Medigap plan to supplement their traditional Medicare coverage.

34.     AARP Medigap is the dominant player in the Medigap market.  Nationwide, AARP Medigap has over three times as many Medigap enrollees as its closest competitor, Mutual of Omaha.  As of December 2012, 32% of all Medicare beneficiaries enrolled in a Medigap insurance plan were in enrolled in AARP Medigap.

35.     The only Medigap plans insured by UnitedHealth, again the largest health insurer in the country, are AARP Medigap plans. Any consumer who wants to purchase Medigap coverage from UnitedHealth must purchase the AARP Medigap plan, and thereby unknowingly fund the 4.95% illegal commission to AARP.

36.     In 2012, AARP generated $704 million in revenues from its so called "royalties," which is nearly three times higher than income generated from membership dues, and makes up 52% of AARP's 2012 total operating revenue.

37.     Of the $704 million in total "royalty" income generated by AARP across all of its product offerings in 2012, $458 million (65%) came from UnitedHealth insurance products.

38.     In 2012 and 2011, the AARP Trust processed $7.8 billion and $7.5 billion, respectively, in insurance premiums from all sources.  In 2012 and 2011, $376 million and $359 million, respectively, was paid to AARP as "royalties" from AARP Trust.

39.     Because of its tax-exempt status, the substantial income that AARP generates has drawn the attention of the IRS and the tax authorities of the District of Columbia on more than one occasion.

40.     In 1999, AARP entered into a settlement agreement with the IRS due to AARP's failure to fully pay unrelated business income tax on its commercial activities.  As part of that settlement, AARP created ASI to act as AARP's "for-profit" arm.  Even with the creation of ASI as a taxable entity, however, AARP still retains the vast majority of its income, tax-free.

**AARP and UnitedHealth's Scheme to Defraud Senior Citizens**

41.     According to AARP's 2010, 2011 and 2012 financial statements, UnitedHealth is AARP's largest business partner – 65% of AARP's "royalty" income is consistently derived from the sale or renewal of UnitedHealth insurance products.  AARP's current AARP Medigap business relationship with UnitedHealth began on February 26, 1997, when AARP and UnitedHealth entered into a joint venture agreement entitled the "AARP Health Insurance Agreement" (the "Agreement").[2]

42.     Under the terms of the Agreement, AARP would: (1) market, solicit, sell and renew AARP Medigap policies with UnitedHealth; (2) collect and remit premium payments on behalf of UnitedHealth; (3) generally administer the AARP Medigap program; and (4) otherwise act as UnitedHealth's agent.

---

[2]     A true and correct copy of the Agreement with all publicly available amendments is attached hereto as Exhibit "A."

43.     In exchange for its services, the Agreement provided AARP with a 4% "allowance" for every dollar received from the sale or renewal of an AARP Medigap policy, as well as an additional 2.5% for each dollar over $1 billion:

ARTICLE 6
ALLOWANCES AND COMPENSATION

6.1 AARP ALLOWANCE.  AARP shall be entitled to receive an allowance for AARP's sponsorship of the SHIP and the license to use the AARP Marks in connection therewith.  ***For each Policy Year, this allowance shall be equal to the sum of (i) four percent of the first $1 billion in Member Contributions plus (ii) two and one-half percent of the Member Contributions in excess of $1 billion***. This allowance shall be payable in accordance with Section 6.7 hereof.

44.     The Agreement was amended in December 28, 1999 in connection with AARP's settlement with the IRS.  The 1999 amendment, *inter alia*, renamed AARP's "allowance"   a "royalty" and directed 8% of AARP's "royalty" to its taxable subsidiary, ASI:

It is intent [sic] of the parties hereto that the payment made by United to AARP pursuant to the United Agreement and referred to as an allowance is a royalty and pursuant to this Assignment and the agreement referred to in this paragraph, the royalty is to be bifurcated into a payment to AARP Services for Quality Control and monitoring and to AARP for use of the AARP Marks. AARP shall grant United an exclusive license to use the AARP Marks by separate agreement. Such separate agreement shall obligate United to compensate AARP for the use of its intangible property by the payment of a royalty.

45.     The Agreement was amended again on December 23, 2002 to increase the amount of AARP's "royalty":

1. Subsection 6.1 of the Agreement is amended by deleting this subsection in its entirety and replacing it with (sic) following:

6.1 AARP Royalty. AARP shall be entitled to receive a royalty for AARP's sponsorship of the SHIP and the license to use the AARP Marks in connection therewith. This royalty shall be 3.25% of Member Contribution for Policy Year 2002 and 3.75% of Member Contributions for Policy Year 2003. For Policy Years 2004 through 2007, the royalty shall be 4% of Member Contribution, with a review of the increased royalty amount on rates and competitive position prior to implementation.

46.     In 2007, the parties extended the Agreement through to December 31, 2014, as explained in UnitedHealth's quarterly report, filed with the U.S. Securities and Exchange Commission ("SEC") on May 9, 2007:

> On April 13, 2007, we entered into an agreement to extend and expand our relationship with AARP through December 31, 2014. The agreement was expanded to give us a right to use the AARP brand on our Medicare Advantage offerings and to *extend our arrangement to use the AARP brand on our Medicare Supplement products and services* and Medicare Part D offerings. (Emphasis added.)

47.     Six months later, the parties further extended the Agreement for an additional three years through to December 31, 2017, as explained in UnitedHealth's 2007 yearly report filed with the SEC:

> On October 3, 2007, we entered into four agreements with AARP that amended our existing AARP arrangements and incorporated many of the terms of the April 13, 2007 AARP agreement. These agreements extended our arrangements with AARP on the Supplemental Health Insurance Program [AARP Insurance] to December 31, 2017, extended our arrangement with AARP on the Medicare Part D business to December 31, 2014, and gave us an exclusive right to use the AARP brand on our Medicare Advantage offerings until December 31, 2014, subject to certain limited exclusions.

48.     On October 15, 2013 AARP and UnitedHealth announced that they were extending the Agreement to run through December 2020.  Stephen J. Hemsley, president and CEO of UnitedHealth Group, noted that "'We are honored to build upon our unique and innovative relationship with AARP, which has helped both UnitedHealthcare and AARP provide better support and value to the consumers we serve.'"[3]

49.     Under the terms of the current Agreement, in exchange for AARP's administering of the insurance program and the  marketing, soliciting, and selling or renewing AARP Medigap policies on behalf of UnitedHealth, as well as its collecting and remitting insurance premiums on

---

[3]     *See* http://www.unitedhealthgroup.com/Newsroom/Articles/Feed/UnitedHealth%20Group/2013/1015BroadenAARP.aspx.

behalf of UnitedHealth, AARP earns a 4.95% commission, disguised as a "royalty," on each policy sold or renewed.

50.     The Agreement's terms require AARP to aid in the solicitation of the sale of insurance and to generally act as the insurance agent of UnitedHealth.

51.     The Agreement also specifically notes that AARP owns all solicitation materials related to the AARP Medigap program:

> 7.2     MEMBER COMMUNICATIONS.
>
> . . . AARP OWNERSHIP. All communications to AARP members pertaining to the SHIP [AARP Medigap included], including without limitation scripts, solicitation materials and other written materials mailed on behalf of AARP to any members, shall be the property of AARP, to the extent specifically identified by United or AARP, as the case may be, as developed and used exclusively for the SHIP. AARP shall have the sole right to copyright all or any of such pieces as it considers appropriate to the fullest extent permitted by law; provided, however, that AARP shall not have the right to copyright the United Marks.

52.     The Agreement as of 2011 was reviewed by Congressional staff members from the House Committee on Ways and Means as part of its investigation into AARP's tax status. AARP's obligations under the Agreement were described in a December 21, 2011 letter from the Ways and Means Committee to the IRS as follows:

> Congressional staff recently had the opportunity to review three redacted contracts between AARP and AARP Services, Inc. (ASI) and United.  The contracts covered United's marketing and sale of AARP branded Medigap, Medicare Advantage, and Medicare Part D policies.  The contracts raised a number of issues related to AARP's involvement in for-profit business activities and governance issues among the various AARP entities.
>
> The three contracts, signed in January 2008 and which are still in effect, detail AARP and ASI's extensive influence over United's operations, most notably in the Medigap business, and several instances in which United is required to take specific actions, beyond making "royalty" payments, to the benefit of AARP.  The contracts include the following provisions that raise numerous questions about AARP's involvement in for profit activities:
>
> > a.     ASI is placed in the role of quality control contractor and overseer of United's operations, as it relates to Medigap, Medicare Advantage, and Medicare Part D.

b. The contracts create a "Senior Leaders" team that oversees all aspects of performance under the contracts. Both United and ASI each have two officials appointed to the "Senior Leaders" team, which coordinates all aspects of contract performance and must consent to any action under the contract. At least one United and one ASI "Senior Leader" must consent to any decision. Further demonstrating AARP's active role in directing the decisions of the insurer, ASI must approve United's appointments to the "Senior Leaders" team.

c. ASI has authority over United's "Operating Plan" and may "approve, modify on a line by line basis, or provide specific direction to United," regarding the plan.

d. ASI is given prior review and approval authority over all proposed electronic, print, verbal, or scripted communication regarding AARP-endorsed Medigap plans directed at both AARP members and non-AARP members.

e. United is responsible for marketing campaign audits and analysis, but all strategy developments and modifications must be made in collaboration with AARP.

f. ASI oversees and monitors the agent certification process and must approve the agent compensation program.

g. ASI has consultation, review, and consent rights related to any proposed plan design changes including, but not limited to, annual budgets, premium levels and rates, and sales and distribution plans.

h. United is barred from directly or indirectly marketing or offering products or programs that compete with AARP-endorsed Medigap plans.

i. ASI has review and modification authority over United's Medigap-related contracts with third-party vendors exceeding $250,000.

j. United must submit to ASI a detailed projection of policy financials, including recommended member premiums for the coming year. ASI may object to the premium levels, and if no agreement is reached the issue goes to dispute resolution.

k. United may contract with ASI separately to perform consulting and marketing services in connection with the sale of AARP-endorsed Medigap plans. Such agreements are separate from the primary contract but indicate the possibility of the AARP subsidiary's further involvement in business operations.

l. United's annual incentive program for senior executives is, in part, dependent on meeting the "transformational" goals established by AARP and ASI.

       m.     Any expenditure of Medigap funds not addressed in the contract requires the prior written approval of ASI.

53.     UnitedHealth compensates AARP to act as its agent in connection with the marketing, solicitation, sale and administration of the AARP Medigap group insurance program.

54.     AARP actively helps solicit and market AARP Medigap for UnitedHealth through television commercials, its website, and advertisements in various periodicals and publications.

55.     AARP is engaged in actively soliciting consumers to purchase AARP Medigap and is thus acting as an unlicensed insurance agent of UnitedHealth.  Examples of this active solicitation include, but are not limited to, the following:

- www.aarphealthcare.com advertises details of AARP Medigap insurance and explicitly states, "**This is a solicitation of insurance**." (Emphasis in original.)

- www.aarphealthcare.com explains some of the terms of the policies that are offered: "A Medicare Supplement Insurance Plan, such as an AARP Medicare Supplement Insurance Plan insured by UnitedHealthcare Insurance Company, may help pay some of the health care costs that Medicare Parts A and B don't cover like copayments, coinsurance and deductibles for Medicare approved services. Your coverage travels with you throughout the U.S. and there are virtually no claim forms to file. Medicare Supplement Insurance plans also let you keep your own doctors and specialists who accept Medicare patients - *and you never need to get a referral!*" (Emphasis in original.)

- www.aarpmedicareplans.com provides even greater detail about the AARP Medigap plans that are offered and allows users to enter their Texas zip code to "View Plans & Pricing."

- www.aarpmedicareplans.com also explicitly states, "**This is a solicitation of insurance**." (Emphasis in original.)

- AARP television and Internet video advertisements promoting the AARP Medigap plans also display the same language, "**This is a solicitation of insurance**." (Emphasis in original.)

- Print advertisements for the AARP Medigap plans in the *AARP Bulletin* magazine note: "**This is a solicitation of insurance**." (Emphasis in original.)

- These same print advertisements provide a toll free phone number, 1-866-314-8679, to call "AARP Health" in order to receive a free information kit to "Tell me more about AARP Medicare Supplement Insurance Plans." The reader is also encouraged to "Call to receive complete information including benefits, costs, eligibility requirements, exclusions and limitations."

- AARP Member Advantages (formerly AARP Health) is "a collection of products, services and insurance programs made available by AARP." The page also notes "AARP knows you want quality, affordable health care. And through relationships with leading companies, AARP makes available a range of health products, services and discounts." *See* www.aarphealthcare.com ("About Us.").

56.     For every AARP Medigap policy sold/renewed, AARP collects insureds' premium payments, plus the 4.95% commission, through the AARP Trust on behalf of UnitedHealth.

57.     After deducting the 4.95% commission from the consumers' payment and remitting this amount to AARP, Inc. and ASI, AARP then invests the insurance premiums that it collects for UnitedHealth in a wide range of securities. *UnitedHealth gives AARP the right to retain any gains on those investments, in addition to its 4.95% commission.* In 2009, 2010, 2011 and 2012, AARP earned $89,985,195, $56,668,525, $14,484,000 and $59,191,000, respectively, on the investment of premiums that it held in the AARP Trust prior to remittance of the premiums due to UnitedHealth.

58.     As premium payments become due, the AARP Trust remits the premiums to UnitedHealth.

59.     The 4.95% commission amount paid to AARP from the AARP Trust is bifurcated with 8% going to ASI and 92% going to AARP, Inc. The left side of a chart from the House Ways and Means Committee members' report, *Behind the Veil: The AARP America Doesn't Know*, demonstrates how AARP receives its commissions from the AARP Trust:



60.   Contrary to the above chart, however, AARP's 4.95% commission is not deducted from the actual insurance premiums paid by consumers.  According to the Agreement, AARP's commission is **charged to consumers <u>on top of</u> the premiums paid for the actual insurance coverage**: "SHIP GROSS PREMIUMS for a Policy Year means the amount of Member Contributions minus the AARP allowance determined under Section 6.1 hereof for such policy year." The Agreement distinguishes between the amount actually billed to and paid by consumers (*i.e.*, "Member Contributions") and the insurance premiums themselves.

61.   Consistent with this provision in the Agreement, Barry Rand, the CEO of AARP, testified before the House Ways and Means Committee on April 1, 2011 that "royalties have nothing to do with the premiums of beneficiaries.  Nothing to do with the premiums."  Mr. Rand also testified that "[a]ll of the money that we have that comes out of the trust in interest goes to our mission.  None of the money is taken out of any of the premiums."[4]

---

[4]      *See* http://waysandmeans.house.gov/news/documentsingle.aspx?DocumentID=261747.

62.     In addition, AARP's then President, W. Lee Hammond, testified the royalty payment was in addition to the premiums for insurance coverage: "We do take royalty payments from that money that comes in, and then, as requested by the insurance companies ***to cover their products***, we return the balance of that money to them."[5]

63.     Mr. William Josephson, Of Counsel at Fried, Frank, Harris, Shriver and Jacobsen, LLP, and former Assistant Attorney General-in-Charge of the New York State Law Department's Charities Bureau, testified at the hearing that the evidence may suggest "the amounts characterized by AARP as royalty really are closer to insurance commissions, which I believe would be subject to unrelated business income tax.  This is a factual inquiry that is not necessarily resolved by questions of law."[6]

64.     Thus, while Defendants disclose the existence of a payment in general to AARP which they term a "royalty" paid for the use of AARP's intellectual property, Defendants hide the fact that the cost of AARP Medigap insurance includes a percentage-based commission to AARP that is funded by consumers, ***in addition to the insurance premium paid to UnitedHealth for coverage***.

65.     Defendants' misrepresentations and omissions regarding AARP Medigap constitute a false, deceptive, and misleading practice in violation of the DTPA.

66.     Defendants' misrepresentations and omissions regarding AARP Medigap also constitute an unlawful deceptive trade practice that is prohibited by Tex. Ins. Code §541.052(a) as well as other violations of Chapter 541, Subchapter B, of the Code as set forth below.

---

[5]     *Id.*

[6]     *Id.*

**Defendants' Conduct is an Unlawful Act or Method
in Violation of the Texas Insurance Code**

67.     Defendants' acts are also unlawful because they violate the Code.

68.     At all material times, UnitedHealth authorized AARP to act as its agent in the marketing, solicitation and sale of AARP Medigap policies.

69.     At all material times, AARP acted as the de facto agent of UnitedHealth, as defined by Tex. Ins. Code §4001.003.

70.     As the agent of UnitedHealth, AARP engaged in the following acts, *inter alia*:

(a)     solicited the sale and renewal of insurance on behalf of UnitedHealth;

(b)     solicited  an application for insurance on behalf of UnitedHealth;

(c)     received, collected, and/or transmitted an insurance premium to UnitedHealth; and

(d)     generally aided in the transaction of the business of insurance

71.     While AARP acts as an insurance agent, it is not licensed to act as such in the State of Texas – a clear violation of the Code.  *See* Tex. Ins. Code §4001.101.  And UnitedHealth has also violated the Code by appointing AARP to act as its agent.  *See id.*

72.     Because AARP is not licensed as an insurance agent, it may not collect a commission for its marketing, solicitation or sale/renewal of AARP Medigap policies on behalf of UnitedHealth, and UnitedHealth may not pay such a commission to AARP.  *See* Tex. Ins. Code §4005.053.  The Code also specifically prohibits percentage-based referral fees to non-licensed entities.  *See id*.  Therefore, AARP's 4.95% commission in and of itself, regardless of AARP's licensing status, is another clear violation of the Code.

73.     In addition, Tex. Ins. Code §1251.004 prohibits an insurer from paying a fee or allowance for services to an individual, firm, corporation or group entity "related to . . . a group accident and health insurance policy."  The 4.95% commission, as well as UnitedHealth's allowance

of AARP to retain investment gains from held premiums, thus violates this section of the Code as well.

**Defendants' Scheme Has Caused Injury to Plaintiffs and the Class**

74.     The end result of Defendants' violations of the Code (which are not disclosed to consumers) is that consumers are charged an artificially inflated insurance price, above and beyond the premiums remitted to UnitedHealth for coverage, that is prohibited by law, and which therefore should not be charged.

75.     Other Medigap policies offered without the highly regarded "AARP brand" offer identical benefits often at a lower cost because those insurers do not secretly charge unlawful insurance agent commissions to consumers.

76.     Defendants' deceptive and unlawful scheme takes advantage of unsuspecting senior citizens who all put their trust in the AARP name.

77.     As a result of Defendants' unlawful acts and conduct, consumers are harmed financially in that they are paying 4.95% above the actual cost of insurance coverage so that UnitedHealth and AARP can illegally divert this 4.95% commission to the unlicensed AARP.

78.     But for Defendants' deceptive and unlawful acts, Plaintiffs and the other members of the Class would not have paid the illegal commission as part of their purchase and/or renewal of their AARP Medigap policies.

## CLASS ALLEGATIONS

79.     Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure,[7] and pursuant to Tex. Ins. Code §541.251, individually, and on behalf of the following Class:

---

[7]     This class action also satisfies the requirements of §§541.256 and 541.257 of the Code.

*All persons in the State of Texas who purchased or renewed an AARP Medigap policy.*

80.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

81.     Specifically excluded from the Class are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

82.     *Numerosity*.  The members of the Class are geographically dispersed throughout the State of Texas and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of members in the Class.  Although the precise number of Class members is unknown to Plaintiffs, the true number of Class members is known by Defendants.  More specifically, UnitedHealth maintains databases that contain the following information: (i) the name of each Class member enrolled in an AARP Medigap policy; (ii) the address of each Class member; and (iii) each Class member's payment information related to AARP Medigap.  Thus, Class members may be identified and notified of the pendency of this action by first class mail, electronic mail, and/or published notice, as is customarily done in consumer class actions.

83.     *Existence and predominance of common questions of law and fact*.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)     whether AARP solicited an application for insurance in the State of Texas and/or aided in the transaction of the business of an insurer without a license in violation of Tex. Ins. Code §4001.101(a);

(b)     whether AARP acted as an agent of an insurer without a license in violation of Tex. Ins. Code §§4001.101(b) and 4054.051;

(c)     whether UnitedHealth appointed AARP to act as its agent while AARP did not hold a license to do so in violation of Tex. Ins. Code §4001.101(c);

(d)     whether UnitedHealth paid, and AARP accepted, a commission for services performed by AARP as an agent in the State of Texas while AARP did not hold a license to act as an agent in violation of Tex. Ins. Code §4005.053(a);

(e)     whether AARP solicited or collected a payment in connection with an application for insurance or the issuance of a policy, other than one allowed by Tex. Ins. Code §550.001(a);

(f)     whether UnitedHealth paid AARP a fee or allowance for services related to a group health insurance policy in violation of Tex. Ins. Code §1251.004(a);

(g)     whether Defendants charged consumers a rate that is excessive for the risks to which the rate applies – *i.e.*, one that is likely to produce a long-term profit that is unreasonably high in relation to the insurance coverage provided – in violation of Tex. Ins. Code §560.002;

(h)     whether Defendants misled consumers into believing that the rate charged for their AARP Medigap policies included only lawful fees relating to their insurance coverage, and not unlawful commissions paid to unlicensed entities in addition to their insurance coverage;

(i)     whether Defendants' misrepresentations constitute an untrue, deceptive, and/or misleading assertion, representation, and/or statement regarding the business of insurance

and/or a person in the conduct of the person's insurance business, which is an unlawful deceptive trade practice that is prohibited by Tex. Ins. Code §541.052(a);

(j)     whether Defendants' misrepresentations constitute an untrue, deceptive, and/or misleading assertion, representation, and/or statement regarding the business of insurance and/or a person in the conduct of the person's insurance business, which is an unlawful deceptive trade practice that is prohibited by Texas Bus. & Com. Code §17.46, and therefore violative of Tex. Ins. Code §541.151;

(k)     whether Plaintiffs and the Class have sustained monetary loss and the proper measure of that loss;

(l)     whether Plaintiffs and Class are entitled to declaratory and injunctive relief;

(m)     whether Plaintiffs and the Class are entitled to restitution; and

(n)     whether Plaintiffs and the Class are entitled to treble and/or punitive damages.

84.     *Typicality*.  Plaintiffs' claims are typical of the claims of the other members of the Class in that Defendants deceived Plaintiffs in the very same manner as they deceived each member of the Class.

85.     ***Adequacy of Representation***.   Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Class.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Class.

86.     *Superiority*.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would, thus, be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore,

even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

87.    In the alternative, the Class may also be certified because:

(a)    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants;

(b)    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

**COUNT I**

**Claim for Injunctive Relief
Under Tex. Ins. Code §541.251**

88.    Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

89.     Section 541 of the Code is broadly intended to protect the consuming public and legitimate business enterprises from those who engage in unlawful, unfair and/or deceptive methods of competition or acts or practices in the business of insurance.

90.     Section 541.251(a) of the Code authorizes class actions for damages and injunctive relief brought to remedy an unlawful method, act or practice defined by Tex. Ins. Code §§541.051-541.061 (Chapter 541, Subchapter B).  The statute specifically authorizes a class action to be brought by an individual damaged by such misconduct, both on the individual's own behalf and on behalf of others similarly situation.

91.     As alleged herein, at all material times, Defendants engaged in the following unlawful methods and/or acts:

(a)     soliciting an application for insurance in the State of Texas and aiding in the transaction of the business of an insurer without a license in violation of Tex. Ins. Code §4001.101(a);

(b)     acting as an agent of an insurer without a license in violation of Tex. Ins. Code §§4001.101(b) and 4054.051;

(c)     appointing AARP to act as an agent of UnitedHealth while AARP did not hold a license to act as such in violation of Tex. Ins. Code §4001.101(c);

(d)     paying and collecting a commission for services performed by AARP as an agent of UnitedHealth in the State of Texas while AARP did not hold a license to act as such in violation of Tex. Ins. Code §4005.053(a);

(e)     soliciting and collecting a payment in connection with an application for insurance or the issuance of a policy other than one allowed by Tex. Ins. Code §550.001(a);

(f)     paying a fee or allowance for services related to a group health insurance policy in violation of Tex. Ins. Code §1251.004(a); and

- 23 -

(g)    charging consumers a rate that is excessive for the risks to which the rate applies – *i.e.*, one that is likely to produce a long-term profit that is unreasonably high in relation to the insurance coverage provided – in violation of Tex. Ins. Code §560.002.

92.    Moreover, as alleged herein, at all material times, Defendants, acting together, affirmatively misled consumers into believing that the rate charged for their AARP Medigap policies included only lawful fees relating to their insurance coverage, and not unlawful commissions paid to unlicensed entities in addition to their insurance coverage, an untrue, deceptive, and/or misleading assertion, representation, and/or statement regarding the business of insurance and/or a person in the conduct of the person's insurance business, which is an unlawful deceptive trade practice that is prohibited by Tex. Ins. Code §541.052(a).

93.    Were it not for Defendants' aforementioned unlawful methods and/or acts and unlawful deceptive trade practice, Plaintiffs and the other Class members would not have paid the illegal commission as part of their purchase and/or renewal of their AARP Medigap policies.

94.    As a result of AARP's aforementioned unlawful methods and/or acts and unlawful deceptive trade practices, Plaintiffs and the other Class members suffered actual damages.

95.    In addition to an order enjoining Defendants' misconduct, if this matter is not resolved within 31 days, Plaintiffs will amend the Complaint and request actual damages.  Plaintiffs are also entitled to recover reasonable costs and attorneys' fees under Tex. Ins. Code §541.252, and will seek to recover such costs and fees at the appropriate time.

## COUNT II

### Claim for Injunctive Relief
### Under Tex. Ins. Code §541.151

96.    Plaintiffs repeat and reallege each and every allegation above, except for those contained in Count I, as though fully set forth herein.

- 24 -

97.     The Texas Insurance Code is intended to broadly protect the consuming public and legitimate business enterprises from unlawful, unfair, and/or deceptive methods of competition or acts or practices in the business of insurance.

98.     Through §541.251, *et seq.* (Chapter 541, Subchapter F) and §541.151, *et seq.* (Chapter 541, Subchapter D), the Texas Insurance Code provides relief to any person and the class whom they represent to redress economic damage caused by, *inter alia*:

(a)     a violation of §§541.051-541.061 (Subchapter B) of the Code;

(b)     the use or employment of a false, misleading, or deceptive act or practice that is specifically enumerated in §17.46 of the DTPA and that is relied on by a consumer to the consumer's detriment. Tex. Bus. & Com. Code §17.50(a)(1)(A) and (B); or

(c)     the use or employment of an act or practice in violation of §541 of the Code. Tex. Bus. & Com. Code §17.50(a)(1)(B)(4).

99.     As alleged herein, at all material times, Defendants, acting together and in concert, failed to disclose information concerning AARP Medigap which was known at the time of the transaction, and such failure to disclose was intended to induce consumers into a transaction into which the consumer would not have entered had the information been disclosed, a false, misleading, and deceptive act and/or practice that is specifically enumerated in §17.46(b)(2), (3), (5) and (24) of the DTPA. When consumers purchase or renew an insurance policy, they rely on the fact that the payments they make for coverage will be used to pay the premiums due for coverage, not the premiums due for coverage plus an illegal payment.

100.    More specifically, Defendants failed to disclose to consumers that the rate charged for their AARP Medigap policies was artificially inflated, as it included an unlawful 4.95% commission payment to AARP for its marketing, solicitation and sale/renewal of AARP Medigap policies on

behalf of UnitedHealth, as well as its services in administering the AARP Medigap program for UnitedHealth.

101.    Defendants' aforementioned failure to disclose information relating to AARP Medigap was intended to induce consumers into purchasing and/or renewing overpriced AARP Medigap policies.

102.    Had Defendants disclosed the fact that the rate charged for AARP Medigap policies was artificially inflated because it included an unlawful 4.95% commission payment to AARP for its marketing, solicitation, and sale/renewal of AARP Medigap policies on behalf of UnitedHealth, as well as its services in administering the AARP Medigap program for UnitedHealth, Plaintiffs and the other Class members would not have agreed to pay the illegal commission as part of their purchase and/or renewal of their AARP Medigap policies.

103.    Plaintiffs and the other Class members relied on Defendants' material omissions regarding AARP Medigap and suffered damages as a result.

104.    Defendants' failure to disclose the aforementioned information regarding AARP Medigap is also an unconscionable action or course of action within the meaning of the DTPA. Specifically, in failing to disclose the aforementioned material information regarding the price of AARP Medigap, Defendants took advantage of Plaintiffs' and the other Class members' advanced age, lack of knowledge, ability, experience, and/or capacity to a grossly unfair degree, to Plaintiffs' and the other Class members' detriment.

105.    Defendants' aforementioned failure to disclose information relating to AARP Medigap rendered their representations regarding AARP's unlawful commission untrue, deceptive, and/or misleading, which is an unlawful deceptive trade practice that is prohibited by Tex. Ins. Code §541.052(a).

106.    Based on these facts and circumstances, Defendants acts and omissions constitute violations of the following provisions of the Texas Insurance Code:

(a)    Section 541.051(1)(A) and (B), prohibiting an entity engaged in the business of insurance from misrepresenting the terms of a policy, or the benefits or advantages promised by the policy;

(b)    Section 541.051(4), prohibiting an entity engaged in the business of insurance from using a name or title of a policy or class of policies that misrepresents the true nature of the policy or class of policies;

(c)    Section 541.052(a), prohibiting an entity engaged in the business of insurance from disseminating public advertisements and materials containing an untrue, deceptive or misleading assertion, representation or statement regarding the business of insurance or a person in the conduct of the person's insurance business; and

(d)    Section 541.061, prohibiting an entity engaged in the business of insurance from making untrue statements of material fact or failing to state a material fact necessary to make other statements made not misleading.

107.    Defendants' acts and omissions made in violation of Chapter 541, Subchapter B were done knowingly.  As such, the trier of fact may award additional damages up to three times the amount of actual damages in accordance with Tex. Ins. Code §541.152(b).

108.    Defendants' deception is a false and deceptive business practice under DTPA, Tex. Bus. & Com. Code §17.41, *et seq.*, which operates as a violation of the Code itself.  *See* Tex. Ins. Code §541.151(2).

109.    The DTPA is intended to broadly protect the consuming public and legitimate business enterprises from unlawful, unfair, and/or deceptive methods of competition or acts or practices in the business of insurance.

110.    Based on the above facts and circumstances, Defendants' acts and omissions constitute violations of the DTPA which is actionable through the Tex. Ins. Code §541.151(2).[8] The policies, acts and practices of Defendants as described above were intended to deceive Plaintiffs and Class members as described herein and have resulted (and will result) in annual fees being imposed on members of the Class.  These actions violated and continue to violate the DTPA, which is actionable through the Tex. Ins. Code §541.151(2), in at least the following respect:

(a)    Defendants' failure to disclose the aforementioned information regarding AARP Medigap is also an unconscionable action or course of action within the meaning of the DTPA.  Specifically, in failing to disclose the aforementioned material information regarding the price of AARP Medigap, Defendants took advantage of Plaintiffs' and the other Class members' advanced age, lack of knowledge, ability, experience, and/or capacity to a grossly unfair degree, to Plaintiffs' and the other Class members' detriment. Tex. Bus. & Com. Code §§17.45(5), 17.50(a)(1), 17.50(a)(1)(B), and 17.50(a)(3);

(b)    in violation of §17.46(b)(2) of the DTPA, Defendants' acts and practices constitute the use of deceptive representations in connection with the products in question by causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(c)    in violation of §17.46(b)(3) of the DTPA, Defendants' acts and practices constitute the use of deceptive representations in connection with the products in question by causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

---

[8]    At all relevant times, the Plaintiffs and all members of the Class were consumers within the meaning of the DTPA, Tex. Bus. & Com. Code §17.45(4).  At all relevant times, Defendants engaged in trade and/or commerce within the meaning of the DTPA, which broadly prohibits unfair and unconscionable acts. Tex. Bus. & Com. Code §17.45(6).

(d)      in violation of §17.46(b)(5) of the DTPA, Defendants' acts and practices constitute the use of deceptive representations in connection with the products in question by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not; and

(e)      in violation of §17.46(b)(24) of the DTPA, at all material times, Defendants, acting together and in concert, failed to disclose information concerning AARP Medigap which was known at the time of the transaction, and such failure to disclose was intended to induce consumers into a transaction into which the consumer would not have entered had the information been disclosed.

111.    Defendants used and employed false, misleading, or deceptive acts or practices specifically enumerated in §17.46(b) of the DTPA and in violation of Tex. Ins. Code §541.051.

112.    Plaintiffs and the other Class members relied on Defendants' material omissions regarding AARP Medigap and suffered damages as a result.  By reason of the foregoing, Plaintiffs and members of the Class have been (and will continue to be) irreparably harmed.

113.    Defendants' failure to disclose the aforementioned information regarding AARP Medigap is also an unconscionable action or course of action within the meaning of the DTPA. Specifically, in failing to disclose the aforementioned material information regarding the price of AARP Medigap, Defendants took advantage of Plaintiffs' and the other Class members' advanced age, lack of knowledge, ability, experience, and/or capacity to a grossly unfair degree, to Plaintiffs' and the other Class members' detriment.

114.    Defendants' aforementioned failure to disclose information relating to AARP Medigap rendered their representations regarding AARP's unlawful commission, untrue, deceptive,

and/or misleading, which is an unlawful deceptive trade practice that is prohibited by Tex. Ins. Code §541.052(a).

115.    In addition to an order enjoining Defendants' misconduct, if this matter is not resolved within 31 days, Plaintiffs will amend the Complaint and request actual damages. Plaintiffs are also entitled to recover reasonable costs and attorneys' fees under Tex. Ins. Code §§541.152 and 541.252, and will seek to recover such costs and fees at the appropriate time.

### DISGORGEMENT

116.    If this matter is not resolved within 31 days, Defendants' assets are subject to the equitable remedy of disgorgement, which is the forced relinquishment of all benefits that would be unjust for Defendants to retain, including all ill-gotten gains and benefits or profits that result from Defendants' fraudulent actions. Defendants should be ordered to disgorge all monies fraudulently taken from individuals and businesses together with all of the proceeds, profits, income, interest and accessions thereto. Such disgorgement should be for the benefit of victimized Class members and the Plaintiffs.

### APPLICATION FOR TEMPORARY INJUNCTION
### AND PERMANENT INJUNCTION

117.    Because Defendants have engaged in the unlawful acts and practices described above, Defendants have violated and will continue to violate the law as alleged in this Complaint.  Unless immediately restrained by this Honorable Court, Defendants will continue to violate the laws of the State of Texas and cause immediate, irreparable injury, loss and damage to the Plaintiffs and Class. Therefore Plaintiffs request a Temporary Injunction and Permanent Injunction as indicated below.

### NOTICE BEFORE SUIT

118.    Pursuant to §§541.154 and 541.255 of the Texas Ins. Code, contact has been made with the Defendants' counsel herein, as well as the Texas Insurance Commissioner, to inform them of the unlawful conduct alleged herein and that this action would be filed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief in their favor and against Defendants as follows:

A.      Plaintiffs pray that Defendants be cited according to law to appear and answer herein; that after notice and hearing, a TEMPORARY INJUNCTION be issued; and upon final hearing a PERMANENT INJUNCTION be issued, restraining and enjoining Defendants, Defendants' successors, assigns, officers, agents, servants, employees and attorneys and any other person in active concert or participation with Defendants, from engaging in the acts or practices complained of herein.

In addition, if this matter is not resolved within 31 days from this date, Plaintiffs will amend the Complaint pursuant to Tex. Ins. Code §541.255(e) and respectfully pray that this Court will:

B.      Order Defendants to restore all money or other property taken from identifiable persons by means of unlawful acts or practices and award judgment for damages in an amount within the jurisdictional limits of this Court to compensate for such losses;

C.      Order the disgorgement of all sums taken from consumers by means of deceptive trade practices, together with all proceeds, interest, income, profits and accessions thereto;

D.      Certify this action and the Class as requested herein, appointing Plaintiffs as Class Representatives, and appointing Robbins Geller Rudman & Dowd LLP as Class Counsel;

E.      Award Plaintiffs and the Class members actual damages, plus court costs and reasonable and necessary attorneys' fees in relation to the amount of work expended, and any other relief the Court determines is proper, pursuant to Tex. Ins. Code §§541.152 and 541.252;

F.      Award restitution and disgorgement of Defendants' revenues to Plaintiffs and the Class;

G.      Award treble damages to Plaintiffs and Class members, pursuant to Tex. Ins. Code §541.152;

H.      Award reasonable attorneys' fees and court costs, including pursuant to Tex. Ins. Code §541; and

I.      Provide such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand trial by a jury on all issues so triable.

DATED:  December 23, 2013                    DOYLE RAIZNER LLP
                                             JEFFREY L RAIZNER (SDTX No. 15277)
                                             MICHAEL PATRICK DOYLE (SDTX No. 13309)


                                             _____
                                             JEFFREY L RAIZNER

                                             Lyondell Bassell Tower
                                             1221 McKinney Street, Suite 4100
                                             Houston, TX  77010
                                             Telephone:  713/571-1146
                                             713/571-1148 (fax)
                                             jraizner@doyleraizner.com
                                             mdoyle@doyleraizner.com

                                             ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                             FRANK J. JANECEK, JR.
                                             CHRISTOPHER COLLINS
                                             655 West Broadway, Suite 1900
                                             San Diego, CA  92101
                                             Telephone:  619/231-1058
                                             619/ 231-7423 (fax)
                                             frankj@rgrdlaw.com
                                             chrisc@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
MARK DEARMAN
CHRISTOPHER C. MARTINS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com
cmartins@rgrdlaw.com

SEAN K. COLLINS, ATTORNEY AT LAW
SEAN K. COLLINS
184 High Street, Suite 503
Boston, MA 02110
Telephone: 617/939-9731
617/227-2843 (fax)
sean@neinsurancelaw.com

Attorneys for Plaintiffs and the Class